**CONSERVATION LAW FOUNDATION OF NEW ENGLAND, INC., et al., Plaintiffs,**

v.

**William CLARK, as he is United States Secretary of the Interior, et al., Defendants.**

Civ. A. No. 81–1004–N.

United States District Court, D. Massachusetts.

June 27, 1984.

---

Joseph McGovern, Asst. U.S. Atty., Boston, Mass., for defendants.

James R. Brown, Spencer & Stone, Boston, Mass., for intervenors.

David F. Cavers, Jr., Kathleen C. Farrell, Stephen D. Anderson, Palmer & Dodge, Arthur P. Kreiger, Boston, Mass., for Conservation Law Foundation of New England, et al.

## MEMORANDUM DECISION

DAVID S. NELSON, District Judge.

This case involves a challenge to a Management Plan ("the Plan") adopted by the National Park Service to regulate the use of Off-Road Vehicles [1] (ORV's) at the Cape Cod National Seashore. Plaintiffs, three environmental organizations [2] and two

---

1. Off-Road Vehicles are vehicles capable of cross-country travel over natural terrain. They are variously referred to as four-wheel drive vehicles, all-terrain vehicles, oversand vehicles, dune buggies, or beach buggies. "Self-contained" ORV's are equipped with sleeping and sanitary facilities.

2. The Conservation Law Foundation of New England, Massachusetts Audobon Society, and the Sierra Club.

users of the Seashore, contend that the Plan, by allowing extensive ORV use on the Seashore, will cause significant damage to the coastal ecosystem and will create impermissible conflicts between ORV's and other recreational uses of the Seashore, in violation of the Cape Cod National Seashore Act, the National Park Service Act, and two Executive Orders.

*Background*

The Cape Cod National Seashore was created by act of Congress in 1961. Pub.Law 87–126, 75 Stat. 284, *codified at* 16 U.S.C. §§ 459b to 459b–8 (1974). Its extensive beaches, dunes, sandflats and saltmarshes stretch down the Cape Cod peninsula on the eastern coast of Massachusetts. The approximately thirty-mile "Outer Beach" on the ocean side of the Seashore is noted for its high dunes, sand cliffs, and attractive beaches.

ORV's were not a major recreational use of the Seashore when it was first established. By 1964, the first year ORV permits were issued, interest had increased to the extent that 964 vehicles were registered. Thereafter, interest skyrocketed and by 1978 the number of permits had jumped to almost 6000. Between 1975 and 1978 ORV use doubled.

The drastic increase in ORV use prompted a five-year study, beginning in 1974, of the effects of ORV's on the Seashore ecology. The study was conducted by scientists from the National Park Service Cooperative Research Unit at the University of Massachusetts at Amherst ("U Mass Study"). The conclusions of this study were published in 1979 by Drs. Paul J. Godfrey and Stephen P. Leatherman in a report entitled "The Impact of Offroad Vehicles on Coastal Ecosystems in Cape Cod National Seashore: An Overview."

Based on the U Mass Study, the Park Service reviewed its ORV management policy for the Seashore. On October 31, 1980 the Park Service published an "Analysis of Management Alternatives (Including Environmental Assessment) For Off-Road Vehicle Use, Cape Cod National Seashore, Massachusetts," 45 Fed.Reg. 72299 (1980). The analysis, which was based primarily on the U Mass Study, discussed four alternatives for regulating ORV use at the Seashore. The alternatives differed in their designation of ORV routes, and overnight camping sites and the limits they placed on the number of ORV's at the Seashore. The Park Service held two public hearings on the alternatives on December 1 and 2, 1980, and also received written comments.

Defendants' Management Plan, dated February 27, 1981 and released March 27, 1981, went into effect April 15, 1981. The Plan, in capsule form, permits the following: use of ORV's in unlimited numbers along a thirty-mile stretch of the Outer Beach except when seasonal high tides or tern nesting seasons prevent continuous beach travel (under such conditions ORV's are allowed along a connecting six-mile inner dune trail); use of a half-mile crossland trail by commercial dune taxis and dune cottage residents; and use by 100 self-contained ORV's of two overnight sites on the beach; no limits on the daily or annual number of ORV's.

Plaintiffs brought this suit on the day the Plan became effective, naming as defendants the Secretary of the Interior, the Director of the National Park Service, the Acting Regional Director of the National Park Service, and the Superintendent of the Cape Cod National Seashore.

*Claims*

The plaintiffs claim that the Plan, as adopted and implemented, violates the Cape Cod National Seashore Act, 16 U.S.C. §§ 459b to 459b–8 (1974) ("Seashore Act"); the National Park Service Act, 16 U.S.C. §§ 1–18j (1974) ("Park Service Act"); Executive Order No. 11644, 38 Fed.Reg. 2877 (1972), *reprinted in note following* 42 U.S.C. § 4321 (1977), *as amended* by Executive Order No. 11989, 42 Fed.Reg. 26959 (1977), *reprinted in note following* 42 U.S.C. § 4321 (1977); and the Secretary of the Interior's general public trust obligations. In addition, plaintiffs claim that the Secretary implemented the Plan without adequate public notice in violation of the Administrative Procedure Act, 5 U.S.C. § 553 (1977) ("APA"). Finally, they allege that defendants' decision not to prepare an

Environmental Impact Statement violated the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) (1977) ("NEPA").

This Court denied preliminary injunctive relief in 1981. Plaintiffs now seek a permanent injunction barring all ORV use on the Seashore until the adoption of an ORV Management Plan that adequately prevents both damage to the Seashore and interference with other recreational uses and that otherwise conforms to the relevant statutes and executive orders. They also request preparation of an adequate Environmental Impact Statement. Finally, plaintiffs seek their costs in bringing this action.

*Jurisdiction*

■ Plaintiffs assert five bases for subject matter jurisdiction, three of which are plainly inadequate.[3] Of the remaining two—federal question and mandamus—the court finds that subject matter jurisdiction exists under the former. Plaintiffs have alleged that defendants, in regulating ORV use at the Seashore, have violated, *inter alia,* the APA, the Seashore Act and the Park Service Act. The matter in controversy, therefore, "arises under the ... laws ... of the United States," 28 U.S.C. § 1331, and federal question jurisdiction is appropriate. *See, e.g., Davis Associates, Inc. v. Secretary of HUD,* 498 F.2d 385, 389 (1st Cir.1974).

In view of the court's determination that federal question jurisdiction exists, plaintiffs' assertion of mandamus jurisdiction becomes important only because of the allegedly different scope of relief and/or standard of review which might obtain under mandamus as opposed to the APA. The mandamus statute provides that district courts "shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or agency thereof to perform a

duty owed to the plaintiff." 28 U.S.C. § 1361.

■ Traditionally, mandamus would issue only upon a finding that there existed a ministerial, clearly defined, and peremptory duty on the part of the defendant to do the act in question, and that no other adequate remedy was available. *See, e.g., Cervoni v. Secretary of HEW,* 581 F.2d 1010, 1019 (1st Cir.1978). However, there has been a recent judicial trend toward expanding the scope of mandamus relief to include review of discretionary agency action. *Davis Assocs., Inc.,* 498 F.2d at 389 n. 5. But in the instant case it is apparent that any remedy available under mandamus would be coextensive with that available under APA § 706(1). Section 706(1) provides that a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed." Courts and commentators have found the scope of relief provided by this section to be the equivalent of that available under mandamus. *See, e.g.,* K.C. Davis, Administrative Law Treatise, § 23:10 at 165 (1983) ("[u]nder ... § 706(1) ... a court may grant mandatory relief, whether the plaintiff seeks mandamus or mandatory injunction or uses some other language to designate mandatory relief"); *Carpet, Linoleum and Resilient Tile Layers v. Brown,* 656 F.2d 564, 567 (10th Cir.1981) (the mandatory injunction being sought was "essentially in the nature of mandamus" and therefore its issuance could be based on mandamus or the APA, or both). The court finds this view of the scope of relief under mandamus and the APA applicable to the instant case.

Plaintiffs also suggest that the availability of mandamus jurisdiction would empower the court to engage in independent fact finding rather than simply to review the agency's findings under the APA's arbitrary and capricious standard.[4] Courts

**3.** The Administrative Procedure Act, the Declaratory Judgment Act, and "further relief" under 28 U.S.C. § 2202 have each been held not to confer independent subject matter jurisdiction. *See, e.g., Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977) (APA); *Skelly Oil Co. v. Phillips Co.,* 339 U.S. 667, 672–74, 70 S.Ct. 876, 879–80, 94 L.Ed. 1194 (1950)

(Declaratory Judgment Act); *Smith v. Lehman,* 533 F.Supp. 1015, 1018 (S.D.N.Y.1982), *cert. denied,* 459 U.S. 1173, 103 S.Ct. 820, 74 L.Ed.2d 1018 (1983) (further relief).

**4.** Plaintiffs' agreement to rely on the submitted record, *see infra,* does not moot this issue. It is clear that independent fact finding, as well as

have indicated that independent fact finding under mandamus is appropriate in some circumstances, even where agency action is under review. *See, e.g., Carpet, Linoleum and Resilient Tile Layers,* 656 F.2d at 567–68, (allegations that government agencies were not adequately enforcing provisions of the Davis-Bacon Act, if proved at trial on merits, would warrant mandamus relief); *Commonwealth of Pennsylvania v. National Association of Flood Insurers,* 520 F.2d 11, 26–27 (3rd Cir.1975) (claim that Secretary of HUD failed to perform duties to publicize availability of flood insurance, if "proved" on remand to district court, would warrant mandamus.)

However, even if appropriate in some situations, independent fact finding is not so in the instant case. The court finds in the pertinent statutes and executive orders no language or legislative intent indicating that the fact-finding process was meant to be entrusted in the final instance to the courts rather than the agency. *See, e.g., Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 685 (D.C.Cir.1982). In fact, the statutes and executive orders grant the Secretary significant discretion in his management of the Seashore. And plaintiffs' suggestion is further belied by the fact that here, unlike in some cases where independent fact finding has occurred under mandamus, the relevant issues are particularly within the agency's competence and expertise. *See, e.g., National Association of Flood Insurers,* 520 F.2d at 26–27. Finally, the court finds that this is not a case where the Secretary has either completely abrogated his enforcement responsibilities or acted clearly outside the bounds of the relevant statutes— two situations that might otherwise justify independent fact finding. *Dunlop v. Bachowski,* 421 U.S. 560, 574, 95 S.Ct. 1851, 1861, 44 L.Ed.2d 377 (1974). Thus, in view of the equivalent scope of relief and standard of review under mandamus and the APA in this case, the court need not decide whether mandamus jurisdiction exists, jurisdiction under the federal question statute being sufficient.

## Standard of Review Under the APA

■ Review of administrative action under the APA's arbitrary and capricious standard is presumed in the absence of statutory language or legislative intent to the contrary. *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 685 (D.C. Cir.1982). As discussed *supra,* no such intent is evident in the instant case. The D.C. Circuit has said that this presumption in favor of limited review

> stems from well ingrained characteristics of the administrative process. The administrative function is statutorily committed to the agency, not the judiciary. A reviewing court is not to supplant the agency on the administrative aspects of the litigation. Rather, the judicial function is fundamentally—and exclusively— an inquiry into the legality and reasonableness of the agency's action, matters to be determined solely on the basis upon which the action was administratively projected.

*Doraiswamy v. Secretary of Labor,* 555 F.2d 832, 839–40 (D.C.Cir.1976).

■ The arbitrary and capricious standard is explained in § 706 of the APA, which states that "the reviewing court shall decide all relevant question of law, interpret ... statutory provisions, and determine the meaning or applicability of the terms of an agency action." Based on this review, the court "shall compel agency action unlawfully withheld or unreasonably delayed; and hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ..." Under the arbitrary and capricious standard, the court must assure itself that the agency "has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent." *Greater Boston Television Corp. v. FCC,* 444 F.2d

the more deferential arbitrary and capricious review, can occur based on a stipulated submitted record.

841, 850 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); *accord, e.g., Chaney v. Heckler,* 718 F.2d 1174, 1189 n. 38 (D.C.Cir.1983). With respect to questions of fact the proper inquiry is whether on the record as a whole the agency could reasonably make the finding that it did. *Pre-Fab Transit Co. v. United States,* 306 F.Supp. 1247, 1250 (D.C.Ill.1969), *aff'd,* 397 U.S. 40, 90 S.Ct. 815, 25 L.Ed.2d 41 (1970). As to questions of law, if the reviewing court finds that the agency has made an error of law, the court must correct it "and after doing so remand the case to the [agency] so as to afford it the opportunity of examining the evidence and finding the facts as required by law." *ICC v. Clyde S.S. Co.,* 181 U.S. 29, 32–33, 21 S.Ct. 512, 514, 45 L.Ed. 729 (1901), *quoted in NLRB v. Pipefitters Local 638,* 429 U.S. 507, 522 n. 9, 97 S.Ct. 891, 900 n. 9, 51 L.Ed.2d 1 (1977). However, "judicial review is not confined to alleged administrative or procedural errors." *Conservation Law Foundation v. Watt,* 560 F.Supp. 561, 567 (D.Mass.1983). Rather, a court's

> [s]upervisory function calls on the court to intervene not merely in case of procedural inadequacies, or by passing on the mandate in the legislative charter, but more broadly if the court becomes aware, especially from a combination of danger signals, that the agency has not really taken a 'hard look' at the salient problems, and has not genuinely engaged in reasoned decision-making.

*Id,* quoting *Greater Boston Television Corp.,* 444 F.2d at 851 (footnote omitted).

### Scope of the Record

The parties have debated extensively the scope of the record this court may permissibly review. The plaintiffs originally sought a trial on the merits of their claims, but, to expedite the case, have since agreed to rely on the administrative record as supplemented by additional documentary evidence proffered to the court by both sides. These documents include affidavits and reports from experts, additional professional and governmental studies and photographs of the Seashore. By contrast, defendants contend that the record developed by the Park Service in adopting its Management Plan is all the court may consider.

■ Generally, the court's inquiry in administrative review cases is "confined to the full administrative record before the agency at the time the decision was made." *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 284 (D.C.Cir.1981), *citing Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). However, a number of exceptions exist to this general rule. Most involve instances where the record submitted by the agency is self-serving, incomplete or unclear. On the basis of three of these recognized exceptions, the court concludes that review of the administrative record as supplemented by the documents noted in the margin is appropriate.[5]

■ First, courts have recognized an exception when evidence either confirming or denying agency predictions made in the original decision subsequently becomes available. *Amoco Oil v. EPA,* 501 F.2d 722, 729 n. 10 (D.C.Cir.1974). In the instant case, the Park Service predicted that the Plan, as implemented, would minimize ORV damage to the Seashore ecology. The Park Service, pursuant to Executive Order 11644, § 8, has monitored the effects

---

**5.** The supplemental record that the court will review includes the seven volume administrative record, ten volumes of the U Mass Study, numerous expert affidavits, an extensive array of photographs, ORV impact studies from other natural areas, a Visual Impact Assessment of ORV's at the Seashore, professional articles on user conflicts, a transcript of a meeting of Park Service representatives to discuss a standard oversand vehicle permit, problem statement by the Cape Cod National Seashore Superintendent concerning ORV's figures on Cape Cod beach visitation, and ORV regulations at other Seashores.

The following proffered documents do not fall under any of the applicable exceptions and therefore must be excluded: comments on general Park Service management policies by the National Park and Conservation Association, and a transcript of an address by then-Secretary of the Interior Watt to the Conference of National Park Concessions on National Park Service Management Policies, 1978.

of ORV use under the Plan and now seeks to supplement the record with the resulting reports and affidavits. The court will allow this supplementation because it will help to "indicate the truth or falsity of agency predictions," *Amoco Oil*, 501 F.2d at 729, n. 10, about the effectiveness of the Management Plan in abating ecological damage. For the same reason, the court will also review the affidavits, photographs, and other documentary evidence submitted by plaintiffs addressing this issue.

▌ The second applicable exception allows supplementation of the record to show factors the agency should have considered, but did not. *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir.1980). The court there said:

It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not. The court cannot adequately discharge its duty to engage in a "substantial inquiry" if it is required to take the agency's word that it considered all relevant matters.

*Id.* In the instant case, it is arguable that the Park Service failed to consider adequately whether extensive ORV use of the Seashore, even if ecologically compatible, was an "appropriate public use" as mandated by the Seashore Act. Therefore, the court will admit documentary evidence that bears on this issue, including professional articles, expert affidavits, and figures on Cape Cod beach visitation. The court, however, is mindful of the *Asarco* court's admonition that:

If the reviewing court finds it necessary to go outside the administrative record, it should consider evidence relevant to the substantial merits of the agency action only for background information ... or for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision. Consideration of the evidence to deter-

mine the correctness or wisdom of the agency's decision is not permitted, even if the court has also examined the administrative record. If the court determines that the agency's course of inquiry was insufficient or inadequate, it should remand the matter to the agency for further consideration and not compensate for the agency's dereliction by undertaking its own inquiry into the merits.

*Id.* (citation omitted).

▌ Finally, a third exception permits introduction of evidence outside the record to explain an unclear or technical record. *Ass'n of Pacific Fisheries v. EPA*, 615 F.2d 794, 811 (9th Cir.1980) (post-decision studies "helpful in understanding the problems faced by the [EPA] and the methodology it used to resolve it ... [and] can be deemed a clarification or an explanation of the original information before the Agency"); *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 239 (8th Cir. 1975). In this case the court is faced with matters of a highly technical nature particularly with respect to the effect of ORV's on dune physiography, vegetation, and aesthetics. The court will accordingly consider reports, affidavits, articles, and photographs submitted by the parties that tend to shed light on these technical matters.

*Preliminary Rulings of Law*

1. Notice Under the APA

▌ The court finds no grounds for relief in plaintiffs' claim that defendants violated the APA by failing to publish the Management Plan in the Federal Register and by scheduling the plan to become effective less than thirty days after it was released. Section 552(a)(1)(D) of the APA requires that an agency publish substantive rules of general applicability in the Federal Register for public guidance. However, even assuming that the Plan can be so characterized, the failure to publish does not necessarily invalidate the agency action. *Donovan v. Wollaston Alloys, Inc.*, 695 F.2d 1, 9 (1st Cir.1982); *Pitts v. United States*, 599 F.2d 1103, 1107–08 (1st Cir.1979). Section 552(a)(1) qualifies the

publication requirement as follows: "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published and not so published." Courts have generally read this portion of the statute as allowing an unpublished agency action to have its full effect on parties who have actual notice. *Yassini v. Crosland*, 618 F.2d 1356, 1361–62 (9th Cir.1980); *Whelan v. Brinegar*, 538 F.2d 924, 927 (2d Cir.1976); *Rodriguez v. Swank*, 318 F.Supp. 289, 295 (N.D.Ill.1970), *aff'd*, 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971). In this case, the fact that plaintiffs filed their complaint on the date the Plan became effective indicates that they had actual notice of its issuance. Thus, plaintiffs' claim about a lack of publication must fail.

Plaintiff's additional claim—that defendants put the Plan into effect less than thirty days after its issuance—is based on APA § 553(d). That section requires that there be at least thirty days between the publication or service of a substantive rule and its effective date. The defendants admit that there was less than thirty days between the date the plan was issued and the date it became effective. But they maintain that the thirty day period was not required for a number of reasons. The court need not consider their arguments, however, because even if a violation of § 553(d) occurred, the violation is *de minimis* and would not warrant the invalidation of the Plan. Courts that have been faced with a violation of § 553(d) have concluded that the appropriate remedy was to delay the effective date rather than to invalidate the rule. *Rowell v. Andrus*, 631 F.2d 699, 704 (10th Cir.1980). In this case, the time for altering the effective date of the Plan has long since passed. Such an order would have no practical effect on the case and the issue is therefore moot.

2. Environmental Impact Statement.

■ Plaintiffs claim that defendants violated NEPA by failing to prepare an Environmental Impact Statement (EIS) with regard to the ORV Plan. The court concludes that the Secretary's decision not to prepare an EIS was not arbitrary and therefore will be sustained. *Aertsen v. Landrieu*, 637 F.2d 12, 19 (1st Cir.1980). Section 102(2)(C) of NEPA, 42 U.S.C. 4332 (1977) requires federal agencies to prepare an EIS for each major federal action that significantly affects the quality of the human environment. The Secretary, through the National Park Service, is the party charged with the duty of determining whether the proposed action is major and significantly affects the environment. *Aertsen*, 637 F.2d at 17. In the instant case, the National Park Service, an agency with significant expertise in environmental matters, has overseen an exhaustive five-year study of the ecological effects of ORV use, analyzed a range of ORV management alternatives based on that study, and, after public comment, issued a Plan. In the Plan, the Park Service concluded that the selected alternatives did not have appreciable effects on the environment and that an EIS would not be prepared. Whether the court would reach the same conclusion *de novo* is immaterial, for its role in determining whether an EIS is required is only to decide whether the Secretary has followed a permissible procedure and has reached a substantive conclusion that is not arbitrary. *Id.* at 19. The court is satisfied that the Secretary has fulfilled both those duties and that, as a result, the two main objectives of NEPA—integrating environmental concerns into agency decision-making and informing the public that the agency has considered environmental concerns in the decision-making process—have been met. *Township of Lower Alloways Creek v. Public Service Electric & Gas Co.*, 687 F.2d 732, 739 (3rd Cir.1982). Furthermore, in this case the Secretary is subject not only to the procedural obligations of NEPA but also to the substantive mandates of the Seashore Act and the relevant executive orders to preserve the Seashore ecology. The court concludes *infra* that the Secretary has adequately complied with this mandate in adopting and implementing the Plan. This conclusion bolsters the court's

ruling that the Secretary's decision not to prepare an EIS is supportable.

The court also decides *infra* that the Secretary has failed to consider adequately whether ORV use is an appropriate public use under the Seashore Act and executive orders. Arguably, some of the factors the Secretary neglected to consider, especially ORV impacts on aesthetics and other recreational values, fall within the scope of an EIS. However, this issue need not be resolved, as any appropriate relief would be coextensive with, if not subsumed by, that ordered herein in connection with the inquiry as to "appropriateness."

3. Enforceability and Effect of Executive Orders

██ Defendants argue that E.O. 11644 as amended by E.O. 11989 does not have the force and effect of law and cannot be enforced by the plaintiffs. The court concludes to the contrary. Executive orders can constitutionally be invested with the status of law if they have "some basis in an act of Congress," *Romero-Barcelo v. Brown*, 643 F.2d 835, 844 (1st Cir.1981), "pursuant to either a statutory mandate or delegation of authority from Congress." *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 234 (8th Cir.1975), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976).

██ In the instant case E.O. 11644 and E.O. 11989 declare that they are "in furtherance of the purpose and policy" of NEPA. Defendants argue that NEPA provides an insufficient foundation for such a substantive order since it makes no reference to executive action and since its "mandate to the agencies is essentially procedural." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). The court does not agree. Congressional authorization for executive orders can be either "express or implied," *United States v. New Orleans Public Service, Inc.*, 553 F.2d 459, 465 (5th Cir.1977), and executive orders based on NEPA have been given substantive effect by federal courts. *E.g., Romero-Barcelo*, 643 F.2d at 859 & n. 50; *Aluli v. Brown*, 437 F.Supp. 602, 609 (D.C.

Hawaii, 1977). In *Romero-Barcelo*, the First Circuit found enforceable an order regulating historic sites that was promulgated pursuant to NEPA and the National Historic Preservation Act (NHPA), 16 U.S.C. § 470 *et seq.*, 643 F.2d at 859 & n. 50. NHPA, like NEPA, makes no express provision for executive orders. Equally important, the court relied principally on NEPA as the statutory basis for its ruling that the executive order applied to current as well as proposed federal activities. *Id.*

Furthermore, E.O. 11644 has been enforced explicitly in one case and implicitly in another. In *National Wildlife Fed. v. Morton*, 393 F.Supp. 1286 (D.D.C.1975), the court invalidated regulations governing ORV use on public lands promulgated by the Bureau of Land Management, finding them inconsistent with the provisions of the Executive Order. And in *American Motorcyclist Assoc. v. Watt*, 543 F.Supp. 789 (C.D.Cal.1982), after citing favorably to the *Morton* decision, the court invalidated ORV route selection criteria contained in a Conservation Area Plan prepared by the BLM, on the ground of inconsistency with the revised regulations that the agency had promulgated following *Morton, supra*. Although neither court specifically addressed the sufficiency of the statutory foundation, they both were plainly satisfied as to the validity of Executive Order 11644.

Defendants also contend that the Executive Orders do not create an implied right of action enabling a third party to seek judicial enforcement of their directives. Defendants' argument misses the mark. Plaintiffs in this case do not seek a private right of action under the executive orders. Rather, their right of action, undisputed by the defendants, arises under the APA. The executive orders instead provide some of the substantive legal standards against which the Secretary's actions are reviewed under the APA.

The Ninth Circuit rejected a similar argument in *Legal Aid Society v. Brennan*, 608 F.2d 1319 (9th Cir.1979) *cert. denied sub nom. Chamber of Commerce v. Legal Aid Society*, 447 U.S. 921, 100 S.Ct. 3010, 65

L.Ed.2d 1112 (1980). Plaintiffs there challenged the government's alleged failure to enforce consistently an executive order requiring the inclusion of affirmative action guarantees in public contracts. Defendants answered that the absence of any implied right of action under the executive order barred the suit based on the reasoning of *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) and its progeny. The court responded:

Appellees do not seek recognition of a supplemental private enforcement mechanism. They do not seek damages for specific acts of discrimination against themselves. They ask only that ... government officials be required to perform the non-discretionary duties imposed upon them by the Executive Order and regulations.... The reluctance of courts to imply separate private enforcement rights from statutes or regulations which provide explicitly only for government enforcement procedures and penalties ... is not applicable to such a private proceeding as this.

If the cases on which appellants rely correctly deny the right to initiate a private suit against a discriminating employer under Executive Order 11246, judicial oversight of enforcement efforts of government officials through such a suit as this becomes doubly important; without it, no remedy would be available against compliance agencies that ignore the specific requirements of the Executive Order and regulations.

608 F.2d at 1332.

It is clear, then, that E.O. 11644 as amended by E.O. 11989 has the force of law and is enforceable by the plaintiffs under APA review.

*Applicable Statutes and Executive Orders*

The Seashore Act, which created the Cape Cod National Seashore in 1961, imposes the following restrictions on the Secretary's management responsibilities:

(b)(1) *In order that the seashore shall be permanently preserved in its present state, no development or plan for the convenience of visitors shall be undertaken therein which would be in-compatible with the preservation of the unique flora and fauna or the physiographic conditions now prevailing or with* the preservation of such historic sites and structures as the Secretary may designate: Provided, That the Secretary may provide for the public enjoyment and understanding of the unique natural, historic, and scientific features of Cape Cod within the seashore by establishing such trails, observation points, and exhibits and providing such services as he may deem desirable for such public enjoyment and understanding: *Provided further, That the Secretary may develop for appropriate public uses such portions of the seashore as he deems especially adaptable for camping, swimming, boating, sailing, hunting, fishing, the appreciation of historic sites and structures and natural features of Cape Cod, and other activities of similar nature.*

*Id.,* § 459b–6(b)(1) (emphasis added).

A review of the statute and its legislative history yields the following conclusions as to the Act's purpose and effect. The Act gives primacy to preservation of the Seashore as it existed in 1961. Any use of the Seashore that would be "incompatible" with the preservation of the ecological and physiographic conditions prevailing in 1961 would be beyond the statutory power of the Secretary to allow. Thus the initial inquiry with regard to the Plan is whether the ORV use there authorized is compatible with the preservation of the Seashore ecology and physiography.

Additionally, the Seashore Act, while countenancing the development of areas of the Seashore for public recreational use, prescribes that such development must respect the overriding preservation mandate of the statute and must be limited to "appropriate public uses" in "especially adaptable" areas. The legislative history of the Act elaborates upon this provision, characterizing it as a "further authorization [to the Secretary] to develop recreational potentialities which do not interfere with the primary purpose of the seashore." H.R.

Rep. No. 673, 87th Cong., 1st Sess., *reprinted in* [1961] IV House Miscellaneous Reports on Public Bills 18. The House Report goes on to elucidate this "primary purpose":

> [T]he major emphasis of the bill is, and *the major emphasis of the National Park Service in administering the seashore must be, on conserving the values* which now make Cape Cod so attractive to so many people and which are in such great danger of being lost—*its scenery, its historical associations, its reminders of an older and quieter way of life than most of us now enjoy, its wildlife and flora.* . . .
>
> The committee . . . recommends strongly that the Secretary of the Interior use all powers at his command to prevent any such indiscriminate use of the seashore as might seriously depreciate the very values which it is being created to preserve.

*Id.* (emphasis added). Thus, any authorized recreational use must be not only ecologically "compatible" but "appropriate" in light of these values the Act seeks to preserve.

The Park Service Act, 16 U.S.C. §§ 1-18j (1974), is a law of general applicability which governs the National Park Service's management of the National Park System including the Seashore. The Park Service Act provides in pertinent part that the National Park Service must administer park lands so as "to conserve the scenery and the natural and historic objects and the

wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." [6] The Park Service Act thus emphasizes the preservation of park lands in their natural, scenic, and historic condition. In this way, the Act reinforces in a general way the specific mandates of the Seashore Act. Both statutes allow for a balancing of preservation and development only to the extent that such development does not derogate from the overriding preservation mandate.[7]

Executive Order No. 11644, 37 Fed.Reg. 2877 (1972) ("Use of Off-Road Vehicles on Public Lands"), *reprinted in note following* 42 U.S.C. § 4321 (1981), *as amended by* Executive Order No. 11989, 42 Fed.Reg. 26959 (1977), *reprinted in note following* 42 U.S.C. § 4321 (1981) ("Off-Road Vehicles on Public Lands"), "sets forth in unambiguous and mandatory language the criteria that are to be employed in the designation of areas and trails for use or non-use of ORV's." *National Wildlife Fed. v. Morton,* 393 F.Supp. 1286, 1295 (D.D.C. 1975). E.O. 11644 directs that specific ORV zones be established on applicable federal lands. The designation of such zones "shall be based upon the protection of the resources of the public lands, promotion of the safety of all users of those lands, and minimization of conflicts among the various uses of those lands." E.O. 11644, § 3(a). Zones are to be located so as to "minimize conflicts between off-road ve-

---

**6.** A 1978 amendment to the Park Service Act declares, in pertinent part:

> The authorization of activities shall be construed and the protection, management and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which those various areas have been established, except as may have been or shall be directly and specifically provided by Congress.

16 U.S.C. § 1a–1 (Supp.1981). The primary purpose of the amendment was "to refocus and insure that the basis for decision-making concerning the National Park System continues to be the criteria provided by 16 U.S.C. § 1. . . ." S.Rep. No. 528, 95th Cong., 1st Sess. 13–14,

*reprinted in* [1977] Senate Miscellaneous Reports on Public Bills.

**7.** Thus the statutes require a level of protection *greater than* that generally extended to National Forest lands under the "multiple use" concept of 16 U.S.C. §§ 528 *et seq.* (1974) ("Multiple Use Sustained Yield Act") (national forests to be "administered for outdoor recreation, range, timber, wildlife, and fish purposes"), but less than that afforded to National Wilderness lands under 16 U.S.C. §§ 1131 *et seq.* (1974) ("Wilderness Act") (national wilderness lands to "be administered . . . in such manner · as will leave them unimpaired for future use and enjoyment as wilderness". *The statute further provides that* "there shall be . . . no use of motor vehicles" (§ 1133(c)).

hicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." *Id.* § 3(a)(3). The Order further mandates that with regard to National Park lands like the Cape Cod National Seashore, ORV trails and areas may be established "only if the respective agency head determines that [ORV] use ... will not adversely affect their natural, aesthetic or scenic values." *Id.* § 3(a)(4). In making such a determination the agency head must "ensure adequate opportunity for public participation...." *Id.* § 3(b). Additionally, the agency head must "establish procedures for the enforcement of [the ORV] regulations," *id.* § 6, and must "monitor the effects" of ORV use and amend the ORV route and area designations "as necessary to further the policy of [the] order." *Id.* § 8.

E.O. 11989, the 1978 amendment to E.O. 11644, further restricts the Secretary's discretion regarding ORV use. It provides in pertinent part that the agency head

shall, whenever he determines that the use of off-road vehicles will cause or is causing considerable adverse effects on the soil, vegetation, wildlife habitat or cultural or historic resources of particular areas or trails of the public lands, immediately close such areas or trails to the type of off-road vehicle causing such effects.

■ The two Executive Orders together add specificity to the preservation and appropriateness mandates of the Seashore Act. Under the Executive Orders, the Secretary must prohibit any ORV use that adversely affects the natural, aesthetic or scenic values of the Seashore. In making such a determination, the Secretary must look not only at the ecological impacts of

ORV's but also their compatibility with other recreational uses and values for which the Seashore was created.[8]

*The Secretary's Decision to Adopt the Plan*

The Plan relied primarily on the U Mass Study. The study, the first of its kind in the nation, experimentally tested the effects of ORV's on the dunes, salt marshes, tidal flats, and beaches of the Seashore. The researchers concluded that:

There is no "carrying capacity" for vehicular impact on coastal ecosystems. Even low-level impacts can result in severe environmental degradation.... Dunes can be quickly devegetated by vehicular passage, resulting in blowouts and sand migration. Of all the ecosystems evaluated, the salt marshes and intertidal sand flats are the least tolerant of ORV impacts. This highly productive and complex system should be closed to all vehicles.

The researchers did not, however, decide that all ORV use was incompatible with the Seashore environment:

At least until further research shows otherwise, the best place for vehicles to travel is the open intertidal beach, as long as this traffic does not interfere with [bird] nesting areas, embryonic dune regions, or zones with major populations of marine animals. Other than the beach, the only place for vehicles to travel, where environmental impact can be kept to a minimum, is through the dunes along specifically marked and well-maintained trails with a minimum of steep grades or sharp turns.

The Secretary's 1981 Plan is generally faithful to the recommendations of the U Mass Study. The plan prohibits completely ORV travel in the salt marshes and tidal

---

**8.** With respect to plaintiffs' claim under the public trust doctrine, the court recognizes the duty of the Secretary of the Interior to see that "none of the public domain is wasted or is disposed of to a party not entitled to it." *Knight v. United States Land Assoc.*, 142 U.S. 161, 181, 12 S.Ct. 258, 264, 35 L.Ed. 974 (1891), *quoted in Commonwealth of Massachusetts v. Andrus*, 594

F.2d 872, 890 (1st Cir.1979). However, in view of the specific congressional and executive mandates concerning the protection of the Seashore and the use of ORV's thereon, any further consideration of such general implied public trust duties would be inconsequential to the court's ultimate decision.

flats of the Seashore. It closes all established trails in the high, migrating portions of the dunes except for an existing one-half mile trail reserved for commercial dune taxi operators, and dune cottage occupants and a six-mile trail for use when high tides prevent passage along the beach and during tern nesting season.

Substantial ORV use is, however, permitted on approximately thirty miles of the Outer Beach subject to beach access regulations of the towns of Truro, Wellfleet and Eastham. Along the stretch of beach between Hatches Harbor and Head of the Meadow, ORV's are limited to a corridor on the backshore portion of the intertidal zone between the berm crest and the drift line.[9] Between Head of the Meadow and Coast Guard Beach, travel is confined to the beach area seaward of the cliffs or toe of existing dunes. No limits are placed on the number of ORV permits sold annually or on daily use of ORV's on these designated routes. The Plan also maintains two camp sites on the beach (previously there were three) for up to 100 self-contained, ORV's.

 The court concludes that the route designations under the Plan reflect a careful attention to and rational interpretation of the U Mass Study. For the most part ORV travel is restricted to the areas of the Seashore identified by the U Mass Study as being the least ecologically sensitive to ORV traffic, generally the intertidal zone of the beach. Travel in the dunes, except for the one-half mile trail for dune taxi operators and dune cottage residents, is allowed only during tern nesting season or extremely high tides and is along a single marked trail. This strategy is in accord with the U Mass Study's recommendations that "most dune trails should be permanently closed, and only those absolutely necessary should be retained," and that "establishing a few, well-managed, 'heavy-use' trails is preferable to many 'low-use' trails."

The Secretary's decision to allow two camping areas on the beach for self-contained ORV's is also rationally based. The record reflects an overriding sentiment that such ORV's, travelling as they do only from paved roads to the beach camping area and depositing their sewage outside the Seashore, pose little threat to the Seashore ecology. Finally, the Secretary's decision not to limit either the annual or daily number of ORV's comports with the finding of the U Mass Study that from an ecological and physiographic perspective "there is little difference between very light use (i.e., a few hundred passes) and very heavy use (thousands)" along well-managed trails.

The court accordingly concludes that the Secretary's decision to adopt the Plan adequately complies with the mandate of the Seashore and Park Service Acts to preserve the Seashore ecology and· physiography. Furthermore, the Plan designates ORV zones in accordance with the findings of the U Mass Study and is therefore respectful of the requirement of Executive Orders 11644 and 11989 that such zones be established so as not to "adversely affect" the Seashore's ecology. In light of these conclusions, the Secretary's decision to adopt the Plan cannot be deemed arbitrary, capricious or an abuse of discretion.

*The Secretary's Implementation and Enforcement of the Plan.*

The plaintiffs allege that, even if the Plan was valid as promulgated, the agency's implementation and enforcement efforts have been so inadequate as to violate the preservation mandate of the relevant statutes and executive orders. They argue in particular that extensive ecological damage is being done to the Seashore by ORV's straying from the designated routes. Defendants reply that the Plan is being successfully implemented and enforced and that where incursions into non-

---

**9.** In the drift line zone, organic matter left by high winter and spring and storm tides decays, releasing nutrients into the sand. Seeds and fragments of beach grass regenerate in this rich drift area, sand collects against the new vegetation, more plants grow in the shelter of this little mound, and slowly a new dune begins. The passage of one or two ORV's over the drift line formed by high winter or spring tides can halt this dune formation process by scattering the drift material and breaking the runners of new plants.

ORV zones have occurred, the ecological effects have been minimal and enforcement has been increased.

The parties opposing contentions about the success of the Plan since its adoption boil down to a battle among experts. Ironically, the two scientists most heavily relied upon by the parties are Drs. Leatherman and Godfrey, who jointly oversaw the U Mass Study but who now disagree on the success of the Plan.

Dr. Leatherman, retained by the plaintiffs, surveyed the success of the Plan during a three-hour visit to the beach on September 20, 1982. In his affidavit he reports that he saw "extensive evidence of vehicle intrusion in areas outside the ORV corridor ... [including] tracks in the vegetation, through the drift [line], and along the toe of the dune." He found that the drift line was "severely damaged." He also said that "[t]he foredune area was frequently damaged by vehicular traffic," that "[m]any areas of the backshore with incipient dunes had been passed through by vehicles," and that posts installed along the length of the beach to mark the drift line "clearly had not deterred some ORV's from driving in this area." He concluded that "the beaches of the Provincelands, particularly the Race Point area, is [sic] not much improved from its [sic] condition in 1977 ... [and that] the ORV Plan for the beach backshore area has not been totally effective." Dr. Leatherman emphasized two additional points: first, that one cannot conclude from the absence of tracks that the area has not previously been damaged because vehicle tracks are quickly erased by waves and storms; second, that the impact of storms does not necessarily mitigate ORV damage.

Plaintiffs also proffer the affidavit of Dr. John M. Teal, an ecologist with the Woods Hole Oceanographic Institute. Dr. Teal visited the Seashore four times in 1981 and 1982 to observe possible ORV damage. He reported numerous violations of the ORV corridor, some crushed vegetation and a marked contrast between the ecological and physiographic condition of the Seashore and that of nearby Monomoy Island where no ORV's are allowed.[10]

Dr. Godfrey, retained by the defendants, paints a very different picture of the success of the Plan. He has monitored the Plan since its implementation through numerous visits to the Seashore. He finds that "most of the beach system is healthy, with expanding dunes," and that the real culprits in beach erosion are not ORV's but rather waves and storm tides. Dr. Godfrey contends that any disruption of the drift line during the summer months is "irrelevant to the health of the dune system," because only the drift lines deposited by winter storms high on the beach are the precursors of new dunes. Regarding the closed areas of the seashore, he says "that few, if any, intrusions into the closed areas occur ... [and] where incursions have been noted, the [Park Service] took immediate remedial action by erecting barricades." He concludes "that the management plan is effectively protecting the coastal resources of the [Seashore]."

Dr. James Allen, a Park Service geomorphologist, also provided an affidavit in support of defendants' contentions. He is currently conducting research at the Seashore concerning dune erosion by storms and the impact of ORV's on this process. Dr. Allen has concluded preliminarily that in the study area at Race Point, "dune scarping does not result from ORV impacts at the toe of the dune, but rather results primarily from extended periods of stormy weather or a single massive storm." He also found that "the Race Point Beach and dunes continue to accrete or grow seaward despite the effects of storms."

In his affidavit Dr. Allen also criticizes Dr. Leatherman's and Dr. Teal's conclu-

---

**10.** Plaintiffs have proffered other affidavits: a Conservation Law Foundation (CLF) staff member provided an extensive array of photographs of alleged ORV damage to the Seashore; a member of the CLF board noted various ORV impacts on the Seashore during a two hour visit;

a professional photographer felt that ORV's intruded significantly into his landscape photography of the Seashore; and a long-time Cape Cod resident observed a variety of adverse impacts on the Seashore caused by ORV's.

sions about the success of the Plan. Regarding Dr. Leatherman's assertion that ORV-caused damage at the Seashore is substantial, Dr. Allen says, "[T]his conclusion is predicated on a mere three-hour tour of the Seashore.... The conclusion is totally unsupported by acceptable empirical data and a scientific methodology and is, in fact, pure speculation." He also criticizes Dr. Leatherman's assertion that damage to vegetation on the toe of the dune will "ultimately lead to scarping of the duneline." Dr. Allen says, that "the studies suggest only that damage to the vegetation will decrease the amount of deposition of windblown sand on the seaward face of the dune. In reality the available scientific evidence shows that scarping occurs when wave action undermines the dune face." As to Dr. Teal's comparison of conditions at the Seashore with those at nearby Monomoy Island where no ORV's are allowed, Dr. Allen responds that "one cannot assume that the beach conditions at Race Point and Monomoy Island can be correlated with each other at any given point in time, in light of their 90° difference in beach orientation to the dominant wave conditions."

A February, 1984 affidavit from Seashore Ranger Irving D. Tubbs, Jr. lends further support to defendants' contention that the Plan is being successfully enforced. Tubbs testifies that significant enforcement efforts have minimized violations by ORV operators. These include a required inspection of ORV's and viewing of a videotape on ORV operation prior to permit issuance, 24-hour ranger patrols during the summer season, arrest of offending ORV operators, the issuance of citations, and revocation of ORV permits. Tubbs says that these and other efforts have resulted in a 24% decrease in violations in 1983 and that of the 189 violations recorded in 1983 only 18 involved illegal use of trails and only one involved the destruction of natural features. Finally, Tubbs testifies that in 1983 there were no intrusions into the closed tidal flat and salt marsh areas and that there were only three intrusions into the high dunes; all violators were apprehended and prosecuted.

In the face of such radically different opinions on the success of the Plan, the court is mindful of its role in reviewing matters of a technical nature:

> [T]he Agency's technical conclusions no less than others ... [must be] founded on supportable data and methodology, and meet minimal standards of rationality... While reviewing courts are not to substitute their judgment for an agency's, they are to establish parameters of rationality within which the agency must operate. A court would abdicate its function were it, when confronted with important and seemingly plausible objections going to the heart of a key technical determination, to presume that the agency could never behave irrationally. It has a duty to see that objections are faced in a proper procedural setting and satisfactory answers provided demonstrating careful agency consideration.

*South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646, 655 & 665 (1st Cir.1974). In the instant case, the court finds that the Secretary's conclusions about the success of the Plan are "founded on supportable data and methodology," that they exceed "minimal standards of rationality," and that "satisfactory answers" to plaintiffs' contentions have been provided demonstrating "careful agency consideration." *Id.* First, the record indicates that defendants have undertaken a more in-depth review of the effectiveness of the Plan than have plaintiffs. Drs. Godfrey and Allen have been engaged in long-term studies and monitoring of ORV impacts on the Seashore since the plan went into effect. Drs. Leatherman and Teal, on the other hand, have based their conclusions on brief visits to the Seashore—in the case of Dr. Leatherman a single three-hour visit.

Second, and more important, defendants' conclusions evince a more careful technical analysis of the conditions at the Seashore than plaintiffs appear to have done. Defendants have systematically studied postplan ORV impacts using both observational and experimental techniques and, in some cases, have quantified their results. Plain-

tiffs, on the other hand, seem to have relied almost exclusively on one-shot qualitative observations in rendering their conclusions.

Finally, defendants' conclusions appear more faithful to the findings of the U Mass Study than do plaintiffs'. For example, plaintiffs' expert Dr. Leatherman, in his affidavit, seems to gloss over the distinction he drew in the U Mass Study between vegetated areas of the Seashore, which have no "carrying capacity" for ORV's, and the nonvegetated areas of the intertidal beach which have a more substantial carrying capacity. Furthermore, Dr. Leatherman, in his affidavit, cites to his research at Fire Island National Seashore for his conclusion that "ORV traffic leaves the beach and dune system more susceptible to severe erosion." However, Dr. Leatherman fails to note his finding in the Fire Island study that ORV use in the corridor between the berm crest and drift line—the ORV route used at Cape Cod—produces little or no erosion, whereas ORV use on or near the vegetated foredunes and dune toe—areas outside the ORV corridor—may produce significant erosion.

In the end, the court finds a rational basis in the record for defendants' assertion that the Plan, as implemented and enforced, is effectively protecting the ecology of the Seashore from the impact of ORV's. To this extent, the Secretary's decision to keep the Plan in effect was not arbitrary, capricious or an abuse of discretion and must be upheld.

*The Secretary's Consideration of the Appropriateness of ORV's on the Seashore*

 The final inquiry is whether ORV use of the Seashore can be deemed an "appropriate public use." 16 U.S.C. § 459b–6(b)(1). Distinguishing between the compatibility of ORV's with the Seashore ecology and their appropriateness as a public use of the Outer Beach involves more than mere semantics. As discussed *supra,* the applicable statutes and executive orders reflect an understanding that a particular recreational activity can be fully compatible with the preservation of the Seashore's ecology but nonetheless be inappropriate as a public use. The court finds

a failure by the Secretary to give adequate recognition to this distinction. Having decided where on the Seashore ORV use would not be ecologically damaging, the Secretary should have more adequately considered whether ORV use, both in general and as regulated under the Plan, can be deemed an appropriate use. The Secretary's failure to undertake this inquiry in an adequate fashion requires a remand.

1. Appropriateness of ORV's Generally

The record indicates a failure to consider adequately whether motor vehicle use of the Seashore *in general* constitutes a legitimate recreational use under the Seashore Act and executive orders. Superintendent Olsen of the Seashore admitted as much to a meeting of the Cape Code National Seashore Advisory Commission. At the January 16, 1981 meeting, one of the committee members was in receipt of a letter from a former aide to Senator Saltonstall, one of the drafter of the Seashore Act. The letter raised the question of whether ORV use was legally consistent with the mandate of the Seashore Act. The minutetaker recorded Superintendent Olsen's response in third person parlance:

> Mr. Olsen said that [the] question had never been raised before and Mr. Martin is raising it for the first time. He felt no one on the park staff thought it was inconsistent with the legislation. At this point he said he would have to agree with Mr. White that the administrators and managers have perceived this as a legitimate recreational use in the park and the only question now is management of that use, just as the park manages swimming or other uses within the park. Jonathan Moore also submitted comments on the legislation as will be discussed as to what is permissible and what is not. He suggested that the Commission proceed with its deliberations today and let management raise the question with the Solicitor's office as to what the interpretation of the legislation is on this issue.

It is important to note that the Analysis of Management Alternatives, the document on which the final Management Plan was based, was written and released prior to the date of the Superintendent's statement. The Plan itself, which was dated just five weeks after the Superintendent's statement, reflects no further analysis of this aspect of the appropriateness question. Rather, the plan merely states, in a boiler-plate fashion, that the mandates of a number of laws, including the Seashore Act, had been respected. Furthermore, the drafters of the Plan stated that "[t]he decision reached above, in our opinion, will protect the resources of the Seashore from further degradation or incompatible uses *where there is scientific evidence to support the need for limitation on use of ORV's.*" (emphasis supplied) The underlined phrase further emphasizes how the Plan relied, legitimately, on the scientific findings of the U Mass Study but failed, contrary to the Seashore Act's mandate, to address adequately the more fundamental, but less scientific, question of whether private and commercial motor vehicle use of the Seashore constituted an appropriate recreational use generally. Superintendent Olsen apparently assumed, without adequate analysis, that ORV use was "an activi[ty] of a similar nature" to "camping, swimming, boating, sailing, hunting [and] fishing ...," 16 U.S.C. § 459b–6(b)(1), and that the only relevant factor was how it was to be managed so as to preserve the Seashore ecology. The court disagrees.

Furthermore, the court gives little weight to the argument implicit in the Analysis of Management Alternatives that because ORV's are a traditional use of the Seashore their use is therefore appropriate. Since the Seashore Act's passage in 1961, any use of the Seashore must withstand scrutiny under the preservation and appropriateness mandates of the Act to be deemed a permissible recreational activity. The only traditional use specifically provided for under the Seashore Act concerns owners of improved property within the Seashore who were granted a right of use and occupancy. 16 U.S.C. § 459b–3. The Act makes no other provision for tradition-al uses, except for the listing of specifically permitted recreational activities in § 459b–6(b)(1). Therefore the mere fact of traditional use should not weigh heavily in a present day determination of appropriateness.

The argument about traditional use is also problematic because of the extreme difference between the magnitude of ORV use prior to 1961 and that in recent years. Defendants themselves admit that "since only a few ORV's ventured out on the dunes and beaches and their effects were unknown, they were not recognized as a significant or potential problem when the National Seashore was created in 1961." As a result, Congress gave scant attention to ORV's in its deliberations on the Seashore Act. The few references to ORV's in the legislative history should therefore have little bearing on a modern day determination of appropriateness.

Additionally, the court finds that the Secretary has assumed, without adequate analysis, that the creation or loss of economic opportunities by businesses associated with ORV use should be a factor in a determination of appropriateness. For example, in discussing the effects of closure of the High Dunes, the Secretary stated:

> The popular recreational pursuit of driving on the High Dunes would be eliminated, possibly resulting in a decline in local gasoline sales and a decline in off-road vehicles sales and services regionally.

The court finds no indication in the relevant statutes or executive orders that such economic factors are to be considered in a determination of appropriateness. On remand the Secretary should more adequately address this issue.

Finally, the court finds that with regard to the determination of appropriateness, the Secretary has not adequately addressed the distinction among the three categories of ORV users at the Seashore: private users, commercial users, and Seashore cottage users. While not deciding the question, it seems clear that cottage owners granted use and occupancy rights by the

Seashore Act, 16 U.S.C. § 459b–3, have the strongest claim to legitimate ORV operation to and from their property as a right appurtenant to use and occupancy. The status of commercial ORV operators is not as clear. On the one hand, these commercial operators have a financial incentive to obey Seashore regulations and they provide handicapped and elderly individuals with access to remote parts of the Seashore. On the other hand, the Seashore Act and executive orders do not, as noted *supra*, give any weight to commercial gain in the appropriateness determination. Private ORV operators can lay no claim to any such right of use or ameliorative influence in meeting the appropriateness mandate. In analyzing the appropriateness question, both generally and under the Plan, the Secretary may find that certain types of ORV users can meet the appropriateness test but that others cannot.[11]

2. Appropriateness of ORV's as Regulated Under the Plan

The record indicates an inadequate consideration of whether ORV's, *as regulated under the Plan*, are an appropriate use of the Seashore. The primary focus of such an inquiry must be on whether the Plan minimizes user conflicts within ORV zones and whether it fairly allocates Seashore lands between ORV and non-ORV users. A report on ORV's prepared by the President's Council on Environmental Quality puts the problem in perspective:

> The most serious conflict arises between ORV operators and nonmotorized picnickers or campers, hikers, backpackers, sightseers, and so on—or between ORVers and persons using the land for educational purposes—students, teachers, researchers.
>
> Nonmotorized recreationists do not enjoy their encounters with motorcycles, dune buggies, and four-wheel drive vehicles, numerous studies have shown. The ORV operator, on the other hand, is often quite tolerant, even oblivious of the person on foot or horseback.

ORVs, in other words, impair other people's enjoyment or understanding of the outdoors on public land. In terms of public policy, this is a problem equal in importance to ORV damage of the environment.

Council on Environmental Quality, Off-Road Vehicles on Public Lands 30 (1979).

An author of another ORV study comments on the user conflict problem in this way:

> The magnitude of the off-road recreational vehicle problem lies in the fact that the off-road vehicle user can extend himself so pervasively into the physical and attitudinal space of virtually all other outdoor recreationists. He does this by his mobility, by the conspicuous sights and sounds he generates, and by the physical impacts or traces his vehicle so often leaves behind. The off-road vehicle is, in effect, a multiplier of man. An individual equipped with an off-road vehicle may equal the physical and aesthetic impact of many traditional users in an area.

Badaracco, "ORV's: Often Rough on Visitors", Parks & Recreation 71 (September 1976). The court finds that to the extent defendants have considered user conflicts, their treatment of the issue has been highly conclusory, generally unsupported by facts, and, in some instances, clearly contradicted by the record.

The record demonstrates little factual basis for defendants' assertion that user conflicts within ORV zones are minimized under the Plan. Defendants, for example, state that a search of the Park Service Complaint Files for 1978–80 revealed no recorded complaints by pedestrian beach users regarding ORV's. However, defendants fail to put this statistic in a useful context. They do not explain how the Complaint File operates, to what extent the public is aware of it, and what the total number of complaints received during 1978–80 was. The court questions whether even with such information it could reliably

---

**11.** Additionally, the Secretary may find that distinctions as to appropriateness may be drawn among the various types of users within each of the three user categories, *e.g.,* self-contained versus sport ORV's in the private user category.

be concluded that user conflicts are minimal.

The U Mass Study on which the Secretary placed primary reliance in creating the Plan barely addressed the user conflict question. Thus, in recommending that ORV's be restricted to the portions of the beach seaward of the dune toe and drift line, the researchers made this explicit caveat: "[h]owever, other factors must also be considered with regard to use of the outer beach, such as conflicts with pedestrians, [and] swimmers...." And to the extent that the U Mass Study did consider the appropriateness issue, it reached a conclusion contrary to defendants'. The U Mass report entitled "Off-Road Vehicle Usage in Federally Managed Coastal Parklands" concluded that ORV use "is most incompatible with several of the more common recreation activities including hiking, swimmers, sunbathing and camping."

Finally, defendants state that during the public comment period, substantial numbers of Seashore users expressed the view that the aesthetic or scenic values of the Seashore are not adversely affected by the presence of ORV's on the beach. However, after carefully reviewing the public hearing transcript and written comments submitted to the Park Service, the court finds that virtually every person expressing such a sentiment was an ORV user or enthusiast, a group that constitutes less than 3% of Seashore visitors. The public record reflects a strong and organized effort by ORV enthusiasts and groups to influence, legitimately, deliberations on the user conflict issue. The record also demonstrates an effort by environmental groups to do the same. However, absent from the record is a systematic determination of the views on user conflicts of the vast visitor population at the Seashore that does not count itself in either camp. A Bureau of Land Management official commented as follows on the need for such a determination with respect to ORV's:

> [O]fficials responsible for determining recreational demand on public park and recreational lands must assume a new burden of going beyond obvious participant groups, however comfortable they are in dealing with them. They must seek out the "general public" through random and systematic polls and surveys and determine its views and needs.... It is too much to expect that John Q. Public will attend every public meeting, workshop, or forum on every issue that is of concern to him. The absence of his volunteered expression cannot be construed as apathy. Recent public opinion surveys show deep general public concern on issues where only special interest groups have taken the necessary efforts to make themselves heard. Recreational planning and management in the future must seek out the general public honestly, objectively and routinely as part of the resource decision-making process.

Badaracco, *supra* at 74. A more systematic determination of the sentiments of Seashore users towards ORV's must be undertaken by the Secretary. The time is ripe for such an inquiry in view of the upcoming summer ORV season and the court's decision not to enjoin ORV use during the pendency of the remand.

The record also demonstrates inadequate consideration of whether the Plan fairly allocates Seashore lands between ORV and non-ORV users, thereby minimizing user conflicts. Badaracco, *supra* at 35, describes the problem in the following way:

> Many studies demonstrate that spatial conflicts underlie much of the hostility of traditional outdoor recreationists toward off-road enthusiasts. Both groups require great space, the former for the generally sought values of solitude and serenity and the latter group, if not for the same reasons, then at least as a requirement to carry on an activity which itself demands space.

The Park Service itself notes that by creating an ORV-free zone at the Seashore

> [A]ctivities which do not depend on the use of a vehicle such as hiking, birding, and pedestrian beach activities would be enhanced because there would be no disturbance by vehicles. There would be no noise or fumes from vehicles and the beaches and dunes would be devoid of

such evidence as tire tracks and ruts. The remote portions of the beach would offer a much greater sense of isolation and escape than under any of the other route designation alternatives.

It is apparent that significant user conflicts create the need for vehicle-free areas at the Seashore, especially along the beaches, where visitor use is most concentrated. Under the Plan six and one-half miles of Cape Cod Bay beaches are ORV-free, as a result of the Secretary's decision to eliminate ORV use in adjacent salt marshes and tidal flats. However, along the Outer Beach on the Atlantic Ocean, where the greatest number of Seashore visitors congregate, according to Park Service statistics, there are only short stretches of ORV-free beaches. This apparent paucity is arguably relieved by ordinances of the Towns of Truro, Wellfleet and Eastham. These ordinances, according to the Secretary, "tend to limit the number of vehicles" travelling on a 15 mile portion of the Outer Beach south of Head of the Meadow beach, that is otherwise designated as an ORV zone. They do so by restricting access over town-owned lands, the only entry and exit points to this cliff-backed stretch of beach. The Secretary places great reliance on these ordinances in concluding that sufficient ORV-free areas exist at the Seashore, especially along the popular Outer Beach. The court finds, however, that the Secretary's conclusion is not adequately supported in the record.

First, the court finds the record lacking in detail as to how these regulations are promulgated, how they are implemented, whether their existence from year to year can be relied upon, and, most important, how effectively they are enforced. The court notes some evidence in the record that the regulations are not being adequately enforced. The court also questions whether the resolution of user conflicts at the Seashore should rely so heavily on the political and budgetary vagaries of local governing bodies.

Second, the Wellfleet and Truro ordinances only restrict access to the ORV zone from June 15 to September 15, and in the case of Truro, only during the daytime. As a result, large-scale ORV-free zones do not exist along the Outer Beach, during some popular warm-weather months, all cold-weather months, and at night in Truro.

Third, it is not at all clear that the ORV-free zone created by the ordinances between Coast Guard Beach and Head of the Meadow provides an adequate substitute for the area of the Outer Shore between Head of the Meadow and Hatches Harbor where ORV's are allowed. The record indicates that the areas are very different. The ORV-free zone is a narrow beach isolated below high sand cliffs with few access points. In contrast the ORV zone is wide, gently sloping and, according to the Secretary, abuts "some of the most spectacular dunes along the Atlantic Coast."

In the end, the court is not satisfied that the Secretary has given adequate consideration to the fair allocation of Seashore beaches between ORV and non-ORV users. A remand for consideration of this issue is therefore appropriate.

On remand the Secretary should consider, among other things, his decision not to create an ORV-free zone between Head of the Meadow and High Head in the present ORV zone on the Outer Beach. The Secretary cited a number of reasons for his decision. Primary among them was the existence of the ORV-free zone created by the town ordinances. The court has already discussed *supra* some problems with the Secretary's reliance on these ordinances. The Secretary also said that creating such an ORV-free zone "would further confine [ORV] use, worsen conflicts between [ORV's] and pedestrians along the remaining Outer Beach, and increasingly jeopardize the safety of pedestrian users." The Secretary's reasoning implies that he chose between concentrating ORV's in a smaller zone thereby increasing user conflicts or spreading the ORV's over a larger zone thereby arguably reducing user conflicts but also decreasing the amount of ORV-free beaches. The Secretary's reasoning fails to consider whether the number of ORV's might decrease if less beach area was devoted to such use just as total

ORV use has decreased, according to the Secretary, since the overall Plan went into effect. If there was such a decrease, non-ORV recreationists could have access to an ORV-free portion of the present ORV zone and user conflicts in the rest of the zone might not increase.

The Secretary also says, with regard to his decision not to create an ORV-free zone, that "a vehicle-free area between High Head and Head of Meadow would seasonally attract greater public use than could be accommodated by existing parking and sanitary facilities ... [and that] given existing future funding constraints it is not feasible to enforce such a ban during the 'off-season.'" Implicit in the Secretary's reasoning is the notion that ORV use in this zone is somehow necessary to control pedestrian user demands on park facilities and that restricting ORV's would be too costly. Such reasoning turns the Seashore Act on its head. The Secretary, contrary to the Act, assumes here and elsewhere that ORV use is the *status quo* at the Seashore rather than those pedestrian activities explicitly designated as such by the Act. 16 U.S.C. § 459b–6(b)(1). The decision to allow ORV use of an area, and thereby reduce the extent of ORV-free beaches, cannot be based on the admitted tendency of ORV's to push out other pedestrian uses and thereby decrease demands on park facilities and finances. The Seashore Act presumes pedestrian activities such as swimming, hiking, sunbathing and birdwatching to be appropriate uses of the Seashore; no similar presumption can be accorded ORV's.

Absent from the Secretary's reasoning about the creation of ORV-free zones and minimization of user conflicts is an adequate discussion of limitations on the number of ORV's allowed on the beach. The court has ruled *supra* that the Secretary's decision not to limit the number of ORV's on a daily or seasonal basis was, from an ecological perspective, not arbitrary. However, with regard to user conflicts and the allocation of Seashore lands, the court finds that the Secretary did not adequately address the limitation issue. It is clear that a reduction in the number of ORV's on the beach at any given time would reduce user conflicts and perhaps thereby address some of the concerns, discussed *supra,* that prompted the Secretary not to create an ORV-free zone. The Secretary argues that enforcing such a limitation would be difficult and costly. The argument begs the more fundamental question of whether ORV use at present levels meets the appropriateness mandate of the Seashore Act. If ORV use at present levels is not appropriate generally, or as regulated under the Plan, and if the Secretary cannot finance a program to limit ORV numbers to an appropriate level, then the use must be eliminated altogether.

*Conclusion*

Pursuant to the court's order dated May 25, 1984, this case was remanded to the Secretary for a determination consistent with the order and· this memorandum of decision. The Secretary was ordered to more thoroughly consider whether ORV use—both generally and as regulated under the Plan—is an appropriate public use of the Seashore. This memorandum has detailed the substance of the inquiry the Secretary must undertake. In particular the Secretary's analysis must include, but is not limited to a consideration of: 1) the general appropriateness of ORV use under the relevant acts and executive orders; 2) the nature and extent of user conflicts within ORV zones established by the Plan, including a more systematic determination of the sentiments of Seashore users regarding ORV's generally and as regulated under the Plan; and 3) the adequacy of the allocation of Seashore beaches between ORV and non-ORV users including a determination of whether ORV-free zones of sufficient size and quality have been provided for under the Plan.

As noted in the May 25, 1984 Order, in conducting the required inquiry the Secretary shall afford an adequate opportunity for public comment and shall solicit other input and conduct any studies that he deems advisable. A written determination shall be prepared and submitted to the court no later than Friday, August 10,

1984, unless such date is extended by the court. Also, as noted in the order, this court will retain jurisdiction of the present case and will be prepared to review the agency's findings immediately upon their completion for the purpose of determining whether any injunctive relief is appropriate. Given the court's finding that there is a rational basis in the record for defendants' assertion that the Plan is adequately protecting the Seashore ecology, and in light of the substantial reliance of ORV users on the present regulations during the upcoming summer season, the Management Plan as presently administered shall remain in full force and effect pending completion of this inquiry by the agency.

The case is remanded for the purposes herein stated.

SO ORDERED.