**MICCOSUKEE TRIBE OF INDIANS OF FLORIDA, a federally-recognized Indian tribe, Plaintiff,**

v.

**UNITED STATES of America, U.S. Army Corps of Engineers, et al., Defendants.**

No. 02–22778–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Oct. 12, 2005.

Kelly S. Brooks, Esq., Lehtinen Vargas & Riedi, P.A., Miami, FL, Kyle A. Lonergan, Esq., Alex L. Wang, Esq., Robert A. Bourque, Esq., Simpson Thatcher & Bartlett, LLP, Brad Sewell, Esq., Natural Resources Defense Council, New York City, for Plaintiff.

Mark A. Brown, Esq., Wildlife and Marine Resources Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC, for Defendants.

## *ORDER*

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Plaintiff Miccosukee Tribe's Motion to Supplement Administrative Record and Incorporated Memorandum of Law (DE # 170).

UPON CONSIDERATION of the Motion and the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

## BACKGROUND

This case arises from Plaintiff, Miccosukee Tribe of Indians of Florida ("Plaintiff" or the "Tribe"), seeking injunctive and declaratory relief arising from certain actions by the Army Corps of Engineers ("Corps") in adopting and implementing an Interim Operational Plan for Protection of the Cape Sable Seaside Sparrow ("IOP"). In February, 2003, the Defendants filed their Administrative Record (DE # s 89–118). On February 17, 2005, the Plaintiff moved to supplement the Administrative Record with a Snail Kite Demography Annual Report (DE # 170).

The Central and Southern Florida Project for Flood Control and Other Purposes ("C & SF Project") is a multi-purpose water management project that was authorized by Congress in 1948. Compl. ¶ 15. The C & SF Project provides both flood protection and water supply for the

developed areas of South Florida through the use of, among other things, the South Dade Conveyance System ("SDCS")—a series of canals, levees and water control structures. *Id.* at 26. Water Conservation Area 3–A ("WCA–3A") is an Everglades marsh comprising in excess of 100,000 acres in Miami–Dade and Broward counties that is part of the C & SF Project area. *Id.* at ¶¶ 17–18. The C & SF Project also affects an area in Miami–Dade County known as the 8.5 Square Mile Area, the Miccosukee Reserved Area, and the Tribe's reservations located along Tamiami Trail and Krome Avenue. *Id.* at ¶¶ 24–25. In order to maintain "acceptable" water levels in WCA–3A, the Water Control Plan and Regulation Schedule guides water managers charged with regulating inflow and outflow of water through the various water control structures within WCA–3A. *Id.* at ¶¶ 21–23.

Following unanticipated environmental consequences, Congress authorized the Modified Water Deliveries Project ("MWD Project") which was intended to better distribute waters between different areas of the Everglades National Park. Pub.L. No. 101–229, 103 Stat.1946 (Dec. 13, 1989) (codified at 16 U.S.C. § 410r–5 tp 410r–8). Although the Complaint is lacking any factual details on the purposes or rationale behind the IOP and the MWD Project, the Court has inferred from the Complaint and other pleadings that water delivery methods employed by the MWD Project led to dire breeding conditions for the Cape Sable Seaside Sparrow (the "Sparrow"). The threatened extinction of the Sparrow in turn led to the proposed implementation of the IOP, until such time as the MWD Project was completed. Compl. ¶ 29.

After a notice and comment period, the Corps issued a Draft Environmental Impact Statement ("DEIS") on the IOP for the protection of the Sparrow in February 2001. Compl. ¶ 31. The DEIS assessed six alternatives, with Alternative 5 as the preferred choice. *Id.* Public reception led to another round of mediation through the Institute for Environmental Conflict Resolution ("IECR") in order to select a plan for the IOP. *Id.* at ¶ 32. After the public comment period on the DEIS ended, the Corps began a series of meetings with various federal and non-federal groups (including the U.S. Fish and Wildlife Service ("FWS"), the Corps, Everglades National Park, and the South Florida Water Management District ("SFWMD")) for the purpose of selecting and recommending a plan for the IOP. *Id.* at ¶ 33. This advisory body selected Alternative 7 as the preferred plan and issued a Supplemental Draft Environmental Impact Statement ("SDEIS") to that end. *Id.* at ¶¶ 34–35. The Corps again took public comments on the SDEIS. *Id.* at ¶ 36. Following the public comment period on the SDEIS, the Corps apparently resumed mediation and developed "Alternative 7R." *Id.* Alternative 7R contained new operational structures and features that were not included in the SEIS, such as the addition of a temporary S–356–like pump station; removal of the southernmost four miles of the L–67 extension levee; and the construction of various, seepage reservoirs. *Id.* at ¶ 39. In April, 2002, FWS issued an amended Biological Opinion on Alternative 7R that predicted that IOP 7R would degrade 88,300 acres of snail kite critical habitat in WCA–3A. *Id.* at ¶ 42. In May 2002, the Corps issued a Final Environmental Impact Statement ("FEIS") recommending Alternative 7R as the Final Recommended Plan. *Id.* at ¶ 43. On July 3, 2002, the Corps issued a Record of Decision adopting the Final Recommended Plan. *Id.* at ¶ 44.

On September 20, 2002, Plaintiff filed a Complaint alleging violations of the National Environmental Policy Act ("NEPA") and Endangered Species Act ("ESA"), im-

proper agency action under the Administrative Procedure Act ("APA"), violations of the rulemaking provisions of the APA, violations of the Fifth Amendment guarantee of due process, nuisance under federal common law, violation of the Indian Trust doctrine, as reflected in the Florida Indian Land Claims Settlement Act of 1982, violations of the Federal Advisory Committee Act, and improper delegation of agency authority, all stemming from allegedly improper action by the Corps in adopting and implementing the IOP. None of these allegations are at issue for purposes of the present motion. Rather, the Court will solely consider whether the Plaintiff may supplement the Administrative Record with a 2003 Report on the severe decline of the Everglades Snail Kite.

On February 17, 2005, Plaintiff moved to supplement Defendants' administrative record with the Snail Kite Demography Annual Report 2003 (the "Report"). Plaintiff first became aware of the existence of the Report through a newspaper article in December 2004. Plaintiff Miccosukee Tribe's Motion to Supplement Administrative Record and Incorporated memorandum of Law ("Pl.Mot.") at 1. Plaintiff contends that this Report should be made part of the administrative record because it "demonstrates that the Tribe's predictions about the disastrous impact that the unanalyzed IOP 7R would have on the endangered Everglades Snail Kite have sadly come true. [The Report] also suggests that the impacts on the Snail Kite, and its critical habitat, have been underestimated because of the failure to use 7R modeling." Pl. Mot. at 3. Presumably, the Tribe seeks to include the Report in the Administrative Record as evidence that the Corps "arbitrarily and capriciously" implemented Alternative 7R without addressing or recognizing the impacts that the IOP would have on WCA–3A.

## DISCUSSION

When reviewing administrative agency action, the "task of the reviewing court is to apply the appropriate ... standard of review ... to the agency decision based on the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–4, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). Indeed, "[t]he reviewing court is generally not empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry ... [The court is] to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *Id.* at 744, 105 S.Ct. 1598. Thus, "while certain circumstances may justify going beyond the administrative record, a court conducting a judicial review is not 'generally empowered to do so.'" *Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir.1996). The "certain circumstances" permitting supplementation of the administrative record referenced by the Court of Appeals include cases where: "(1) an agency's failure to explain its action effectively frustrates judicial review; (2) it appears that the agency relied on materials not included in the record; (3) technical terms or complex subjects need to be explained; or (4) there is a strong showing of agency bad faith or improper behavior." *Id.* at 1246 n. 1 (citing *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436–7 (9th Cir.1988)). *See also Miccosukee Tribe of Indians of Florida v. United States*, 1998 WL 1805539, *14 (S.D.Fla. Sept. 14, 1998) (same); *Kirkpatrick v. White*, 351 F.Supp.2d 1261, 1271–2 (N.D.Ala.2004) (same).

Plaintiff, however, relied on an entirely different list of exceptions, not recognized by the Eleventh Circuit. Specifically, a

district court in *Esch v. Yeutter,* 876 F.2d 976 (C.A.D.C.1989), recognized the following eight exceptions: "(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage." *Esch v. Yeutter,* 876 F.2d at 991. Although Plaintiff implicitly concedes that these eight factors are not recognized by the Eleventh Circuit in its Response to Federal Defendants' Memorandum in Opposition to Plaintiff's Motion to Supplement the Administrative Record ("Pl.Response"), the Court will address the three *Esch* exceptions on which Plaintiff relies in its opening Motion. *See* Pl. Response at 5. In its Response, the Plaintiff also contends that the Corps' exclusion of 7R modeling "borders on bad faith or improper behavior ... which is another exception to the record only rule" under the law of this Circuit. *Id.* at 4. The Court will consider the application of this exception as well.

*A. The Corps Failed to Consider Factors Which Are Relevant to its Final Decision*

■ According to Plaintiff, "the alarming decline of the endangered Snail Kite corresponds with the exact years that the Corps implemented its ISOP and IOP water management actions. The threat to the Snail Kite population was not evident in the FEIS, because the Corps refused to use the Alternative 7R modeling ..." Pl.

Motion at 4. Regardless, however, of the Corps' refusal to use the Alternative 7R modeling, this Motion proposes to supplement the Administrative Record with a Report that was not generated until over a year after the challenged decision. Thus, Plaintiff's contention that the Corps "failed to consider serious consequences to the environment, failed to adequately address reasonable alternatives, or has 'otherwise swept stubborn problems or serious criticism under the rug'" is to no avail when the Report did not exist at the time the decision was made. Pl. Motion at 4.

Furthermore, as Plaintiff concedes, Defendants did not wholly ignore the potential impact on the Snail Kite. In the deposition of Mary Ann Poole, the FWS employee responsible for producing the Amended Biological Opinion, Ms. Poole acknowledged that 10.5% of the designated critical habitat could be negatively impacted by IOP. Pl. Motion at 8. Furthermore, in response to Plaintiff's comment that "The amended BO in the FEIS states that Alt 7R will degrade 88,300 acres of Tribal Everglades and 10.5% of snail kite habitat," the Defendants acknowledge that "some degradation of snail kite critical habitat in state-owned WCA–3A may occur." *See* Administrative Record ("AR"), Tab 56 MI–3. Although the Corps' conclusions may have been more accurate with the 7R modeling, to require such pinpoint accuracy would place an undue burden on the Corps that would be inconsistent with the law of the Eleventh Circuit.

*B. Evidence Arising After the Agency Action Shows Whether the Decision was Correct or Not*

Plaintiff next advances the notion that extra-record information may "be considered by a reviewing court, where such information takes the form of newly dis-

covered evidence that undermines the soundness of the agency's decision." Pl. Motion at 6 (citing *United States v. Akzo Coatings of America, Inc.,* 949 F.2d 1409, 1429 (6th Cir.1991)). As the Defendant correctly recognizes, however, in *Akzo Coatings* the Sixth Circuit based its decision on the unique purposes of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). There, the Court of Appeals notes that "[i]n light of the congressional intent expressed in the statute that public comment and state participation are to be encouraged and considered," the supplemental affidavit at issue, which was filed one month after the administrative record was filed, should have been considered by the district court. *Id.* at 1427. The Court similarly noted that the "this treatment of new evidence reflects the intent of the statute and comports with the proper limited role of courts in reviewing CERCLA consent decrees ...." *Id.* at 1428. Nonetheless, the Court cautioned that its decision was reached with "some reservations," in light of the Supreme Court's admonition that "[i]f upon the coming down of the order litigants might demand rehearing as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated ...." *Id.* (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 554–5, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (quoting *ICC v. Jersey City,* 322 U.S. 503, 514, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944))).

Plaintiff's reliance on *Amoco Oil v. EPA,* 501 F.2d 722 (D.C.Cir.1974) is similarly misplaced. In *Amoco Oil,* the Court of Appeals for the District of Columbia Circuit permitted supplementation of the record with a number of documents, only one of which was created after the EPA's decision. 510 F.2d at 729 n. 10. Specifically, the Court opined that "the testimony bears directly upon the plausibility of certain predictions made by the Administrator in promulgating the Regulations." *Id.* Here, while the Corps' predictions of the impact of the IOP on the snail kite habitat was not precisely in line with the Report, the predictions were not so askew as to "bear[ ] directly upon the plausibility of certain predictions." Indeed, the Report that the Plaintiff seeks to include in the administrative record is far more akin to "a technical study submitted to [the] EPA after promulgation of the Regulations" that the Court of Appeals did *not* allow into the record "[a]s the Regulations could not have been formulated on the basis of this study ...." *Id.*

Finally, in *Conservation Law Foundation of New England v. Clark,* the Court noted that "[g]enerally, the court's inquiry in administrative review cases is confined to the full administrative record before the agency at the time the decision was made." 590 F.Supp. 1467, 1474 (D.Mass.1984). The Court nonetheless allowed supplementation of the administrative record "where the record submitted by the agency is self-serving, incomplete or unclear." *Id.* As such, the Court allowed *the agency* to supplement the record with reports and affidavits confirming the agency's predictions regarding the off-road vehicle damage to the Cape Cod National Seashore ecology. *Id.* As the Defendant points out, here—unlike in *Clark*—"the preferred information has not been vetted by the Corps through any established administrative process and should not be added to the record in this case." Def. Opp. at 5.

### C. NEPA Cases

The third exception that Plaintiff purports is applicable is that "in NEPA cases, the first issue a court must consider is

whether the agency considered all relevant factors in its EIS." Pl. Mot. at 7. Although "[d]eviation from this 'record rule' occurs with more frequency in the review of NEPA cases than in the review of other agency decisions," *Nat'l Audubon Soc. v. Hoffman,* 132 F.3d 7, 14 (2d Cir.1997), the Court also noted that such deviation is "limited." *Id.* at 15. "Courts may conduct plenary review, and consider additional information obtained from the parties through affidavits or testimony, only when the administrative record is so inadequate as to prevent the reviewing court from effectively determining whether the agency considered all environmental consequences of its proposed action." *Id.* Plaintiff has not met this substantial burden here. The most that can be said is that the Corps did not accurately predict the scope of damage to the Snail Kite in implementing Alternative 7R, but neither did the Corps completely ignore the potential impact. AR, Tab 56 MI–3. The Court therefore declines to supplement the record on the basis of this exception, which has not been recognized by the Eleventh Circuit in any event.

### D. The Corps Acted in Bad Faith

In its reply, the Plaintiff submits one last argument that does fall into one of the exceptions recognized by this Circuit—that is, "[t]he exclusion of the 7R modeling borders on bad faith or improper behavior on the part of the Corps." Pl. Res. at 4. For the purposes of this Motion, the Court disagrees. First, it should be reiterated that the Plaintiff is seeking inclusion of the Report, not 7R modeling. Clearly, the exclusion of the Report—which was generated over a year after the challenged decision—does not amount to bad faith. Further, this Court requires a strong showing of bad faith, not action that Plaintiff contends "borders" on bad faith. *See Preserve Endangered Areas of Cobb's History, Inc.,* 87 F.3d at 1246; *Miccosukee Tribe of Indians of Florida v. United States,* 1998 WL 1805539, \*14. The Plaintiff has failed to meet this standard.

### CONCLUSION

Based on the foregoing, it is ORDERED and ADJUDGED that Plaintiff's Motion to Supplement Administrative Record and Incorporated Memorandum of Law (DE # 170) is DENIED.